JACKSONVILLE, TAMPA & KEY WEST RAILWAY
COMPANY, APPELLANT, VS. STEPHEN HARRIS, AP-
PELLEE.

1. A letter from an owner of live stock to a railroad company noti-
fying it of the killing of his stock by a train, giving also the
time and place of the killing, and expressing a desire to be in-
formed as early as possible what the company will pay him for
the stock, is not inadmissible as evidence of notice and claim
for damages under the statute making railroad companies that
fail to erect and maintain fences sufficient to turn and exclude
all live stock from their railroads, with stock-guards at certain
crossings, on account of the omission of the letter to state the
amount of the damage claimed; nor is a letter stating the
amount claimed inadmissible because it was not written at the
time of the killing, nor until seventy-five days after, or because
it offers to to take less than the owner believes he was entitled
to. The two letters held to constitute ample notice and pre-
sentation of claim under the statute.

2. Where an instruction is not calculated to mislead the jury, al-
though not as full or specific as it might be, and no request has
been made for a fuller instruction, no advantage can be taken
by the losing party on account of such deficiency.

3. It can not be assumed as a matter of law that the general attor-
ney of a railroad company is not a proper officer or agent to
notify and present a claim to for damages to live stock under
the railroad fence law, where the company has neither at-
tempted to show that he was not such, and not made any ob-
jection to proof of demand upon him, on the ground that he
was not such officer or agent.

4. The railroad fence statute requires notice of claim to be given
"to any general agent or officer of such corporation or person,
or to any station, depot or other agent or officer acting for said
corporation in the county where the live stock was killed or in-
jured." *Held*, That the words subsequent to the word "offi-
cer," where it appears the second time, do not qual-
ify any of the preceding words except those after the word
"person."

5. The general requirement of the railroad fence statute, wherever
the act is operative, is the erection and maintenance, on both
sides of any railroad, of substantial fences sufficient to exclude

or turn from the roads all live stock, or at least such stock as are orderly, or not shown to be breachy; with the limitation, however, that in lieu of fences, stock-guards shall be erected and maintained at public crossings and at such other crossings as may be necessary for the use of owners or tenants of land adjoining a railroad. Where there is no crossing of the character indicated, the duty is to maintain a fence of the required character, and as between the owner of stock and the company, a gap and bars are to be regarded as a fence and kept in the condition necessary to serve all the purposes of a prescribed fence. It seems that where a company has erected a sufficient fence and it is thrown down without the company's knowledge, by the act of God, or by strangers without the company's knowledge or consent, the law accords to the company a reasonable time for ascertaining the fact and restoring the fence, and if any damage is caused, by the fence being thus down, before there has been a reasonable time for the company to restore it after being so aware, or for learning of its being down and restoring it, the company will not be liable; and a doctrine, at least somewhat similar, is applicable where bars or gates at a crossing are left open without the company's consent or fault.

6. Where there is a gap, with bars, in a railroad fence, at a place where there is no public or other authorized crossing, and the gap is used, with the knowledge of the company, by persons supplying the company with wood under contract, and engaged in hauling the same to a wood-rack on the road, to be used by the company's engines, and such bars are left down by such persons so engaged, and live stock pass through the gap and go on to the road and are killed, the persons so leaving the bars down can not be regarded as strangers to the company, but their acts will be regarded as the act of the company and it will be held liable for the damage resulting to the owner of the stock.

7. A declaration alleging that the railroad company did not maintain fences on the sides of its railroad sufficient to exclude and turn live stock therefrom, by means whereof and for the want of such fences two horses of the plaintiff, without default or negligence on his part, strayed and went on such railroad, describing the point, at which place such a fence was necessary to exclude and turn live stock, which place was not in a town or city, nor at any crossing authorized by the statute, using its language in describing the same, and that said horses so being

on said railroad at the place stated, a certain engine ran upon and killed said horses, giving their value; is good as against a motion for arrest of judgment on the ground that the declaration does not show that the damage was caused by a failure to erect and maintain fences or stock-guards.

Appeal from the Circuit Court for Volusia county.

### STATEMENT.

The declaration, after stating that the defendant was a railroad corporation under the laws of the State operating a line of railroad in Volusia county on June 28th, 1888, avers: That the company, not regarding the statute in such case made and provided, did not then and there maintain fences on the sides of its railroad sufficient to exclude and turn live stock therefrom, by means whereof and for the want of such fences two horses of the plaintiff, without any default or negligence on the part of plaintiff, then and there strayed and went upon the said railroad at a certain place, in township 14, south of range 28 east, in said county, at which place such fence was then necessary to exclude and turn live stock from said railroad, and not where the said railroad then ran through a town or city, nor at a public crossing, nor at a crossing necessary for the use of owners or tenants of lands adjoining said railroad; and the said horses so being on the said railroad, there, to-wit: at the place in that behalf aforesaid, a certain engine and cars of the defendant then driven and governed by divers agents of the defendant on the said railroad, then and there ran and struck upon said horses, and thereby said horses, each of the value of $200, were killed and wholly lost to the plaintiff. That more than thirty days prior to this action plaintiff gave notice and presented his claim in writing for the damage sustained by the

plaintiff by the killing of said horses, as aforesaid, to a general officer of the defendant, in the county aforesaid, but the defendant failed to pay such claim for the space of thirty days thereafter, and has ever since failed and refused to pay such claim or any part thereof, and concluding properly.

The defendant pleaded, 1st, not guilty; 2nd, that it had and did provide and maintain fences on the side of its track at the places and points named in the declaration sufficient to exclude and turn live stock therefrom; 3rd, contributory negligence upon the part of the plaintiff; and, 4th, that it had never been served with a notice in writing as provided by the statute, and alleged in the declaration; and the plaintiff having joined issue there was a trial by jury which resulted in a verdict for the plaintiff for the sum of $302.50 damages, and motions in arrest of judgment and for a new trial having been made and denied, judgment was rendered for the stated amount, and for $114 as costs.

The suit is founded upon the act of May 13th, 1887, which, in so far as the purposes of this case call for a statement of its provisions, enacts that every railroad company operating a railroad in this state shall erect and maintain substantial fences on the sides of such railroad (except through towns and cities, unless said towns and cities require the same), sufficient to turn and exclude all live stock therefrom, with stockguards at all public crossings, and at such other crossings as may be necessary for the use of owners or tenants of land adjoining such railroad; and in case of a failure to erect and maintain said fences and stockguards as aforesaid such corporation shall be liable for all damages which shall be done by its engines or cars, to any live stock, caused by a failure to erect or main-

tain such fences and stock-guards. The statute also provides that when any live stock is so killed or injured, the person entitled to damages therefor shall give notice and present his claim therefor to any general agent or officer of such corporation, or to any station, depot or other agent or officer acting for the corporation, in the county where the live stock was killed, such notice or presentment of claim to be in writing; and if, after such notice, the corporation shall fail to pay the claim for the space of thirty days suit can be brought on the claim; and if, as presented, it was reasonable and just, the jury or judge shall assess as damages against the corporation the actual damage to the live stock so killed or injured, fifty per cent. interest per annum on such damage from the day of the presentment of the claim, together with all reasonable attorney's fees. It also enacts that if the corporation shall deem the claim presented to be unreasonable and unjust, and shall tender or offer to pay all reasonable or just damages for the stock so killed or injured, and the claimant shall refuse to accept the amount tendered or offered to be paid, and upon the trial the jury or judge, under the proofs, shall find a verdict for not more than the amount tendered or offered, the court or judge shall render judgment against the plaintiff for all reasonable costs, and such costs shall be deducted from the amount assessed as damage to the live stock, and the plaintiff shall be entitled to no attorney's fees. Acts of 1887, pp. 114, 115; Rev. Stats., Sections 2271, 2272, 2275-2277.

The other facts are stated in the opinion.

*J. R. Parrott and T. M. Day, Jr.*, for Appellant.

*B. M. Miller* for Appellee.

RANEY, C. J.:

The testimony shows that the horses of the plaintiff were killed near a wood-rack about a half-mile from his home, and a mile and a half from the town of Seville, and were found there by the plaintiff and the section boss and his hands and others, early in the morning of June 28th, 1888, lying on the side of the railroad, and that, as indicated by their tracks, they had walked through a gap in the railroad fence and on to the railroad. The gap was used for hauling in wood for the locomotives by two men named Stephens, who are spoken of by one witness as owning the rack. There was another rack in the same locality owned by another person, but on the opposite side of the gap. There was no railroad crossing at the gap. The plaintiff testifies that the gap was open when the horses were found, and he saw no bars or poles. One witness testified that he had seen bars or poles, about the size of his arm, up at the gap, but did not recollect that any were up when he and plaintiff found the horses on the named day. Another witness says that they were down, and that he had seen the gap the evening before between sunset and dark and they. were down then, he having met the Stephenses coming home just before he got to the gap. The foreman of the section of the road where the horses were killed testified that it was a part of his duty to see that the road and fences were in proper condition, and that he found the horses on the morning stated, and that the bars were opened on the side that the Stephens rack was. That there were three bars provided for the gap, reaching from 3½ to 4 feet from the ground. He had found the bars down before this, not knowing who left them

down, and had got his men to put them up; that he had warned persons to put them up; thinks he went by the day before the accident at 12 o'clock and the Stephens boys were in sight with a load of wood for the rack'and the bars were down, but he did not warn them to put them up, yet had done so before. That the wood-rack men hauling wood for the company were supposed to put up and take down the bars. That he had notified the company that it was a dangerous place; notifying the road master who "saw that they were kept up," and who went down there and got after these men about it. That witness did not shut the bars every night, as if he had he could not have done much of anything else; yet that he had them put up when he found them down, and would have done so on the day preceding the accident if he had not seen the cart coming with the load of wood. A section hand stated that he had put up the bars under the section master's direction, that he saw the bars down on the day and under the circumstances stated by the section master, and he never knew them to be left open by the section master, and that the bars were not quite three feet high. The testimony as to the ownership and value of the horses need not be stated.

The first assignment of error is as to the admission in evidence of two letters offered by the plaintiff. One of them is dated July 4th, 1888, and is from the plaintiff, the substance of it being that the fast mail train going south on the morning of June 28th, killed two horses of the writer, near the 86-mile post, and that he was desirous of knowing what the company would pay him for them; that the killing had been reported by the section master; and requesting to be communicated with as early as possible relative to the matter, and to let him know what the company would do in the case.

Here it should be stated that the plaintiff in testifying as to the killing of the horses and his finding them, said that he gave notice to the railroad company, sent a letter to General Mason, and that they wrote back and offered him eight dollars for the horses. The other letter bears date September 11th, 1888, and is from B. M. Miller, Seville, Fla., to J. R. Parrott, attorney for defendant company. It states that Harris has retained him to prosecute his claim against the company for the two horses, killed on June 28th, 1888, and that if the company was willing to settle the matter without suit the plaintiff would take $200 in full satisfaction of his claim; and if it would not, the writer was instructed to bring suit at once; and asked for the company's decision at once. The admission of the second letter was objected to on the ground that it was an offer of compromise, and not a notice, but the ground of the objection to the former letter is not given. The objections were overruled and the defendant excepted. Waiving, for the purposes of this case, the deficiency of the objection to the letter from Harris, we, in view of the letter from Miller, fail to see in the objection urged here good ground for excluding the letter from Harris. Such objection is that the letter does not set any sum as the amount of the damage or present his claim. True it does not state the amount of the claim, yet it presents a claim and fully discloses the basis of it, and the deficiency as to the amount is fully cured by Miller's letter. The objection to Miller's letter, that it was not written at the time of the killing is not good, the statute not making this an essential; and the other one, that it is an offer of compromise, is palpably without merit, even if we admit it is an offer to take less than the plaintiff believed himself to be entitled to. The two letters, considered together, consti-

tute an ample notice and presentation of claims under the statute. Whether, in the absence of Miller's letter, the testimony of the plaintiff, that when he gave notice to the railroad company, it wrote back and offered him eight dollars for the horses, would not supply the alleged deficiency of the plaintiff's letter, need not be considered.

The conclusion announced above disposes also of one of the charges requested by the defendant.

The second assignment of error is as to a charge in which the judge used, among others, the expression: "If you find that the plaintiff after the killing of the horses gave notice of such killing as required by law, and made presentment of his claim in writing for such killing." The objection urged is, that as there was a question in the case whether or not the notice and claim had been presented to any one of the officers specified in the statute, the jury should have been instructed what the law was in order that they might pass understandingly on that point. Under the facts of the case we do not see that the instruction was calculated to mislead the jury. If defendant desired any further instruction they should have asked for it. It can not be assumed as a matter of law that the general attorney of the company, which Mr. Parrott is testified by one of the witnesses to have been, was not a general agent or officer of the company within the meaning of the act, or that General Mason, to whom it must be concluded the letter from the plaintiff was written, was not a proper officer or agent within the meaning of the act to give notice to. Indianapolis, P. & C. R. Co. vs. Truitt, 24 Ind., 162. In the absence of any attempt upon the

part of the company to show that Parrott was not an officer or agent of the company for the purposes of notice and demand under the act, the jury were justified in concluding that he was such an officer or agent. The conduct of the company in the premises is at least a tacit admission that he was, the notice to Mason was recognized by the company, in its offer of eight dollars, as having been given to a proper representative, and no objection to proof of demand upon Parrott was made on the ground that he was not a proper representative of the company.

Another charge requested by the defendant, and properly refused, may be disposed of by saying of the provision of the statute requiring notice of claim to be given "to any general agent or officer of such corporation, or person, or to any station, depot or other agent or officer acting for said corporation in the county where said live stock was killed or injured," that the words subsequent to the word "officer," where it appears the second time, do not qualify any of the preceding words except those after the word "person."

An instruction requested by the defendant, and the refusal of which is made the basis of an assignment of error, is: "If you find that the cause of the presence of the plaintiff's horses on the defendant's railroad track was the negligence of persons, not the agents or servants of the defendant, in leaving down the bars provided by the defendant to close an opening in the fence, and that the defendant, its agents and servants were not guilty of negligence in failing to replace the bars, you will find for the defendant."

A disposal of this point requires some observations upon the nature of the statute. The general requirement of the act is the erection and maintenance, by corporations and persons operating railroads in our

State, of substantial fences on both sides of the rail-roads, and the fences must be sufficient to exclude or turn all live stock from the roads, or at least such stock as are orderly, or not shown to be breachy. This re-quirement is not applicable in cities or towns unless they make it so. There is a limitation upon the gen-eral requirement even outside of cities and towns, which is that in lieu of fences, stock-guards shall be erected and maintained at public crossings and at such other crossings as may be necessary for the use of owners or tenants of land adjoining a railroad. In case of a failure upon the part of a railroad company to erect and maintain a fence of the character indi-cated, wherever the statute so requires, the company is made liable for all damage by its engines or cars to any live stock, caused by a failure to erect or maintain such a fence. If a failure upon the part of the company to erect or to maintain the fence or stock-guard, as the case may be, at a place where the stat-ute contemplates that one or the other shall be maintained, is the true cause of the injury, such neglect of duty makes the company liable. Where there is no public crossing, nor a cross-ing that is necessary for the use of owners or tenants of lands adjoining a railroad, the duty is to maintain a fence of the character indicated. Here there is no crossing of any kind, and the simple question is, has such a fence, as the law requires to exempt the rail-road company from liability for injury to live stock, been maintained? As between the owner of live stock and the company, the gap and bars are to be regarded as a fence, and the company's measure of duty is not diminished by the existence of the gap and bars. It was at least the duty of the company to maintain the gap and bars in an efficient condition for excluding and

turning live stock from the railroad. These gates, says the opinion in Chicago & N. W. Ry. Co. vs. Harris, 54 Ill., 528, speaking of one at a farm crossing, are a part of the fence, and the duty to keep their fences in repair includes the duty of keeping them safely and securely closed so as to afford equal protection from stock getting upon their roads at such places as at other points. It is true that where a company has erected a sufficient fence, and such fence is thrown or broken down without the company's knowledge, by the act of God, or by strangers without the company's knowledge or consent, the law accords to the company a reasonable time for ascertaining the fact and restoring the fence, and if any damage is caused, by the fence being thus down, before there has been a reasonable opportunity or time for restoring it after being aware of its being down, or for learning of its being down and restoring it, the company will not be liable; and somewhat similar doctrine is applicable where bars or gates at a crossing are left open without the company's consent or fault. Harrington vs. Chicago, R. I. & P. R. R. Co., 71 Mo., 384; Clardy vs. St. Louis, I. M. & S. Ry. Co., 73 Mo., 576; Case vs. St. Louis & San Francisco R. R. Co., 75 Mo., 668; Walthers vs. Missouri Pacific Ry. Co., 78 Mo., 617; Rutledge vs. Hannibal & St. Joseph R. R. Co., *Ibid*, 286; Perry vs. Dubuque & Southwestern Ry. Co., 36 Iowa, 102; Aylesworth vs. Chicago, R. I. & P. R. R. Co., 30 Iowa, 459; Henderson vs. Chicago, R. I. & P. R. R. Co., 39 Iowa, 220; Davis vs. Chicago, R. I. & P. R. R. Co., 40 Iowa, 292; Munch vs. New York Central R. R. Co., 29 Barb., 647; Hodge vs. New York Central & H. R. R. R. Co., 27 Hun, 394; Morrison vs. New York & New Haven R. R. Co., 32 Barb., 568; Robinson vs. Grand Trunk Railway Co., 32 Mich., 322; Toledo, C. S. & D. Ry. Co. vs.

Eder, 45 Mich., 329; Grand Rapids & Indiana R. R. Co. vs. Monroe, 47 Mich., 152; Lemon vs. Chicago & Grand Trunk Ry. Co., 59 Mich., 618; Brown vs. Milwaukie & Prairie du Chien Ry. Co., 21 Wis., 39; Goddard vs. Chicago & Northwestern Ry. Co., 54 Wis., 548; Illinois Central R. R. Co. vs. Swearengen, 47 Ill., 206; Chicago & Alton R. R. Co. vs. Saunders, 85 Ill., 288; Toledo & Wabash Ry. Co. vs. Daniels, 21 Ind., 256; Indianapolis, P. & C. R. Co. vs. Truitt, 24 Ind., 162. Here, however, there is no such case; on the contrary, the gap is one which was not only authorized by the company, but also used solely for a purpose or to an end that was essential to the operation of the road. Grant that it is said that the parties who hauled the wood owned the wood-racks, still it is clear that they were furnishing the wood and hauling it in through the gap and depositing it on the racks close to the track under contract with the company and for its use, and it is apparent from the testimony of the company's employes that the company regarded the keeping of the bars up as a part of the company's duty, and moreover was aware that it could not rely on the men engaged in hauling the wood to perform that duty. The leaving of the bars down by these persons or any of them while engaged in hauling wood, was not the act of a mere stranger to the company within the meaning of the cases cited above, but was an act done by those who, as between the company and the public, were acting for the company; and the only reasonable inference to be drawn from the testimony is that the bars were left down by these parties the afternoon before the accident, and while hauling wood for the company, and there is no proof, nor can it be assumed, that they

were ever put up after being seen by such agents to be down.

Under a statute of New York, requiring railroad corporations to erect and maintain fences on both sides of their roads, no exception being made or permission given thereby for openings or gates for the use of the corporation or its customers or the public generally, but only for the use of adjoining proprietors, it was decided in Spinner vs. New York Central & R. R. R. Co., 67 N. Y., 153, that if the company permits or acquiesces in the use, in its business, by its customers, of a gate constructed by it at a farm crossing, so that the gate does not serve the end of a fence, it is in default. The gate through which the plaintiff's cattle entered, had for several years been used almost daily in the business of loading and unloading freight, vehicles delivering or taking goods, passing in or out thereat; and in this business the company's servants had helped. In consequence the gate was left open at the close of the day's business, and would be closed in the evening or at midnight by defendant's servants. The adjoining proprietor for whose use the gate was originally erected had not used it for six weeks before the accident, and had no knowledge of its use for his purposes on the preceding day. The cattle had escaped from plaintiff's enclosure in the night time on to the highway and thence through the gate and had got on to the railroad and been killed or injured by a passing train. It was held that the evidence was sufficient to authorize an inference by the jury that the gate was open by reason of its use by defendant's customers during the day, or some day shortly prior; that the defendant had sufficient notice that the gateway had been diverted from its original purpose to a common passageway for its customers, and that it was often

left open in consequence thereof; that the opening of it at all, by its assent or acquiescence, was in contravention of the statute, and that if such use of the gate was not of itself sufficient to charge defendant, it was bound to see that when the use of it for the day was over it was well closed, and that for a neglect of this duty it was liable. It is said in the opinion, that when the farm gate is put to the use of the company or its customers, or made subservient to the business of the former, it is not a farm gate *pro tanto*, but as a panel in the fence taken down by it or them, and, if left open, it is as a panel left fallen down. That it is bound to keep that gate also in good repair, not simply in sound material condition, but in such state as is required for a division fence, or as will turn away cattle from its track. If it permits, invites and shares in such a use of the gateway as, to its knowledge or notice, results in the gate not serving the end of a fence, it fails in its duty. In effect, the gate is then no longer merely a gate at a farm crossing: for the use alone of an adjoining proprietor, but it has become the fence of the defendant. When it has knowledge or notice that the gate is customarily left open, or when, from the manner of the use of it, it has notice that such result is likely to happen, it is in statutory default if it does not see to the closing of it, when the use of it is over for the day or other shorter period.

In Cleveland, C., C. & I. R. R. Co. vs. Swift, 42 Ind., 119, the railroad had been fenced, but a panel of the fence had been cut out and made into the form of a gate, but not hung on hinges, and the opening was used by persons hauling wood and placing it near the railroad track, and this was done with the consent of the railroad company, or without objection from it, as

sub-tenant of the plaintiff being one of the persons hauling wood; and while he was so hauling, the gate was so set up that hogs of the plaintiff passed through the opening and upon the railroad, and were killed; and it was held that these facts did not show such negligence on the part of the plaintiff as to prevent his recovery; and that if a railroad company allow an opening to be made in the fence inclosing its road and left insecure, it can not be said that the road is securely fenced; and if animals pass through the same and upon the railroad, and are killed, the company is liable without proof of negligence on the part of the company. See also Laude vs. Chicago & Northwestern Ry. Co., 33 Wis., 640; Indianapolis & Cincinnati R. R. Co. vs. Logan, 19 Ind., 294; Illinois Central R. R. Co. vs. Arnold, 47 Ill., 173; Chicago & Northwestern Ry. Co. vs. Harris, 54 Ill., 528.

It could not be inferred, at all reasonably, from the evidence that the bars were left down by any one but the men who were shown to have been engaged in hauling wood, and this being so, and those men, according to the principles governing the case, not being strangers to the company, there was no error in refusing the instruction. Considering the character of the testimony just referred to, the instruction was more or less irrelevant and was calculated to mislead the jury, if not accompanied by a qualification excluding the idea that those hauling wood are not such strangers. The judge, among other instructions, told the jury that a railroad company is not liable for horses killed by its trains unless it was negligent or failed to erect and maintain proper fences and stock-guards, and that the burden was upon the plaintiff to show that the company did not maintain fences sufficient to exclude and turn live stock.

The declaration is sufficient against the objection that it does not show that the damage was caused by a failure to erect or maintain said fences or stock-guards, and the motion in arrest of judgment was properly denied; and the other assignments of error, in so far as they merit notice, are disposed of by what has been said.

The judgment is affirmed.